[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**January 27, 2005**
**THOMAS  K. KAHN**
**CLERK**

No. 04-12353
Non-Argument Calendar

_____

D. C. Docket No. 02-00073-CV-HL-6

JERRY JACKSON LEE, II,
D.O.,

Plaintiff-Appellant,

versus

HOSPITAL AUTHORITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(January 27, 2005)**

Before BLACK, BARKETT and GODBOLD, Circuit Judges.

PER CURIAM:

Jerry Jackson Lee, a medical doctor, enjoyed staff privileges at a hospital

operated by the Hospital Authority of Colquitt County, Georgia.  The hospital required its staff to renew hospital privileges every two years.  Dr. Lee's renewal application led to an investigation into his professional competency.  He sued seeking injunctive relief and damages, alleging that the hospital failed to follow its bylaws concerning the renewal of his staff privileges.  The district court granted summary judgment for the hospital.  We affirm.

The hospital's medical staff reappointment application required that applicants disclose any prior suspensions of privileges or disciplinary action at any hospital.  The form asked:  "Have your privileges at any hospital ever been suspended, diminished, revoked, or not reviewed."  Another question asked:  "Have you ever been denied appointment, clinical privileges, renewal thereof or been subject to disciplinary action by any hospital or medical organization."  Dr. Lee answered both of these questions in the negative.

Dr. D.W. Adcock, a retired physician employed as the hospital's Medical Director, initially reviewed Dr. Lee's application.  Dr. Lee's negative answers to the two questions quoted above raised Dr. Adcock's suspicions.  He was aware of an incident that had occurred at another hospital in Worth County, relating to Dr. Lee's performing a hysterectomy on a woman who was pregnant at the time.  He recalled that the incident was well known in the Worth County community and

that it had been reported in a newspaper. He also recalled that Dr. Lee had received some form of discipline for this incident. He wrote Dr. Patel, the chief-of-staff of the Baptist Hospital Worth County seeking information on Lee's staff privileges at that hospital. Also he requested that Dr. Lee meet with him "to discuss a staff matter." At that meeting Dr. Lee confirmed that he had performed a hysterectomy on a pregnant woman and that he had been suspended for a period of several days. He explained that the medical staff at the other hospital had told him the incident was a "non-event" and that he need not mention the matter in his application for reappointment at the Colquitt County hospital. In another letter to Dr. Adcock, Dr. Lee stated that he had been placed on a temporary suspension during the investigation of the incident at the Worth County hospital, but stated that the suspension had been "rescinded."

By a subsequent letter to Dr. Adcock, Dr. Patel described the Worth County hospital's response to the incident involving the hysterectomy as follows:

> In May of 1999, Dr. Lee's clinical privileges were summarily suspended based on his care and treatment of a patient at Baptist Hospital Worth County. His suspension was lifted after a three-week period with the understanding that peer review activities, as well as a quality assurance review, were ongoing.

> In July of 1999, Dr. Lee was placed on probation for a period of twelve months with mandatory consultation and proctoring of his GYN surgical cases. During this time, I was responsible for

3

consulting with Dr. Lee and approving all his GYN surgical cases prior to surgery. I also conducted a prospective review of all of his surgical cases during this year.

Dr. Lee's probationary period ended in July of 2000 with the expectation that he will continue to institute and follow practices and procedures standard within his specialty and in line with his delineation of privileges.

The Medical Executive Committee of the Colquitt County hospital appointed an ad-hoc committee to investigate Dr. Lee's application. The ad-hoc committee referred charts of Dr. Lee's cases to an outside consultant for review. After review the consultant issued a written summary of his findings. He participated in a telephone conversation with members of the ad-hoc committee, and expressed concern that Dr. Lee's frequency of surgical complications was "outside the range of statistical probability."

The ad-hoc committee scheduled a meeting with Dr. Lee to discuss their concerns regarding his application and to give him an opportunity to respond. Dr. Lee inquired whether he would be required to attend the meeting if he resigned. After being told that he would not, he requested that a letter be written stating that his privileges at the hospital had not been altered, suspended, or revoked. Such a letter was written, and Dr. Lee then formally resigned. His resignation was accepted, and the ad-hoc committee halted its investigation.

4

Federal law directs that a hospital investigating one of its physicians must report the results of its inquiry to a National Data Bank. See 42 U.S.C. § 11133. This is a reporting agency established by Congress to "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101. The Medical Executive Committee determined that it was obligated to make a report to the National Data Bank of its investigation of Dr. Lee. The Georgia Medical Board was notified that Dr. Lee was under investigation by an ad-hoc committee regarding patient quality of care issues at the time of his resignation from the staff at Colquitt Hospital. The notice explained that the investigation was not complete, that it has been discontinued, and that no conclusions were reached. A report was subsequently placed in the National Data Bank that Dr. Lee voluntarily surrendered his clinical privileges "while under, or to avoid, an investigation relating to professional competence or conduct."

Under Georgia law hospitals must comply with their bylaws when making determinations regarding staff privileges. St. Mary's Hosp. of Athens, Inc. v. Radiology Prof'l Corp., 205 Ga. App. 121, 126-27 (1993). This responsibility ensures that hospitals do not arbitrarily and capriciously deprive physicians of the right to practice at the hospital. See id. The precise standard of compliance is

determined by the purpose of the requirement. Accordingly Georgia law does not demand absolute adherence to the bylaws, only substantial compliance to ensure that physicians are not arbitrarily deprived of their staff privileges. See Widen v. Atlanta Hosp. Sub Issue B., Inc., 194 Ga. App. 890, 892 (1990). When hospitals fail to comply with their bylaws and arbitrarily revoke staff privileges the injured physician can maintain an action under O.C.G.A. § 51-1-6. See St. Mary's Hosp., 205 Ga. App. at 126-27. O.C.G.A. § 51-1-6 provides:

> [w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damages thereby.

In a full and careful order the district court correctly applied the Georgia standard. It found that Dr. Lee had failed to create a genuine issue of material fact with regard to each element of his claim. We agree with this assessment. The undisputed evidence showed that the investigation of Dr. Lee's application for reappointment and of his surgical complications was conducted in a manner consistent with the hospital's bylaws, and there was no evidence to show that the hospital knowingly made a false report to the National Data Bank.

The decision of the district court is AFFIRMED. The clerk is directed to direct the clerk of the district court to forward the decision of the district court for publication in the Federal Supplement.

6